UNITED STATES v. GREAT NORTHERN R. CO.

(Circuit Court, S. D. New York. June 3, 1907.)

1. CARRIERS—INTERSTATE COMMERCE—REBATES—"GIVEN" DEFINED.

A railroad company subject to the interstate commerce laws, which paid rebates to a shipper in 1904, is subject to prosecution therefor under the Elkins act (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]), although the agreement therefor was made before the passage of such act. Such agreement was unlawful and unenforceable under the original interstate commerce law, and the rebates cannot be said to have been "given," within the meaning of the Elkins act, until their actual payment; and, as so construed, the act as applied to such a case is not an ex post facto law.

2. SAME—ELKINS ACT—EFFECT OF REPEAL.

The Elkins act (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]) is in full force as to offenses created thereby committed prior to the time it was superseded by the Hepburn act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 892]).

3. SAME—PUBLISHED RATES—THROUGH RATES.

A carrier which accepts and carries an interstate shipment on a through bill of lading, openly charging the sum of the published local rates between the points named therein, thereby creates a through rate and accepts the published aggregate as the lawful through charge; and any rebate given therefrom is a violation of the Elkins act (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]).

4. INDICTMENT—DUPLICITY.

Under the provision of the Elkins act (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]) making it an offense for an interstate carrier to "offer, grant, or give" rebates, where the transaction is completed, the substantive offense is the payment and receipt of the rebate; and an indictment therefor is not bad for duplicity because it also avers the offer or agreement pursuant to which the payment was made.

5. CONSTITUTIONAL LAW—ELKINS ACT—DUE PROCESS OF LAW.

The Elkins act (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]) is not unconstitutional as depriving shippers or carriers of property rights without due process of law.

On Demurrer to Indictment under the Elkins Act for Giving Rebates.

Joseph G. Dudley, for demurrant.
Henry L. Stimson, U. S. Atty.

HOUGH, District Judge. The specifications of demurrer may be, and have been by counsel, reduced to the following heads: (1) When this indictment was found, in February, 1907, there was no statute in force proscribing as a crime the acts complained of by the government. (2) To give to the statute under which the indictment is alleged to have been found a construction necessary to sustain the in-

dictment is to make the statute ex post facto and therefore unconstitutional. (3) The indictment is defective in failing to sufficiently allege that the defendant transported the property at less than tariff rates, in that the tariff rate alleged to be violated is not shown upon the face of the indictment. (4) The indictment is bad for duplicity. (5) The statute upon which it is based is otherwise unconstitutional.

The substance of the indictment is that in the fall of 1902 the defendant agreed with the American Sugar Refining Company to transport certain sugar from New York and/or Boston to Sioux City, Iowa, the merchandise to be taken from the shipping points via divers appropriate railway lines to Buffalo, thence by steamship from Buffalo to West Superior, and thence by defendant's line of railway from West Superior to Sioux City. The published tariff from New York and/or Boston to West Superior was 28 cents per 100 by all of the several possible routes converging as above indicated at Buffalo, and at the same time the defendant's published rate from West Superior to Sioux City was 24 cents per 100. It is alleged that the defendant agreed to return to the shipper out of the above aggregate tariff of 52 cents, or out of its own portion thereof, 19 cents per 100 pounds. In pursuance of this agreement certain sugar was transported, and thereafter, and in May, 1904, certain rebates were paid by the defendant as the result of the foregoing arrangement. The second count of the indictment is based upon the same original agreement, and only varies from the first in alleging as the indictable offense that in June, 1904, certain other moneys were paid by the defendant in pursuance of the same rebating arrangement. In 1902, when the agreement was made, the act of February 4, 1887, commonly known as the "Interstate Commerce Act," was the only statute presumably applicable to the transaction then contemplated and agreed upon. In 1904, when the moneys were actually paid, the act of February 19, 1903, commonly known as the "Elkins Act" (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]), was in force; and this indictment was found after the passage of the act of June 29, 1906, commonly known as the "Hepburn Act" (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 892]) and the joint resolution of June 30, 1906, declaring when the Hepburn act should take effect.

First. Although it may be assumed that no indictment could have been found under the interstate commerce act against the carrying corporation, yet the arrangement above outlined was under that act alone illegal and unenforceable. Texas & Pacific Ry. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011. The said unlawful arrangement was not completed until 1904, when the moneys were paid. United States v. Hanley (D. C.) 71 Fed. 675. When the transaction was completed the Elkins act had made each and every part thereof not only unlawful, but a criminal offense. One part thereof, and certainly the most important, was giving the rebate and accepting the same, and it is a refinement of language to say that the rebate was given or accepted until the amount thereof was paid. This occurred in 1904, and this act was the crime complained of in the indictment. A solvent contractor may be said to have given some pecuniary advan-

tage to another when he has agreed to give it, his contract being enforceable in ordinary course of law; but if a man agrees to give another an unlawful pecuniary advantage, something not enforceable at law at all, it appears to me plain that the person to whom the promise is made has gotten nothing whatever until he has received and pocketed the pecuniary fruits of such illegal arrangement. If the payment and acceptance of the rebate constituted a crime in 1904, I do not think that the passage of the Hepburn act prevented the finding of this indictment. On the contrary, within the period of the statute of limitations, I think the Elkins act is in full force as to offenses committed prior to the passage of the Hepburn bill, and can add nothing to the views expressed in U. S. v. Standard Oil Co. (D. C.) 148 Fed. 719, U. S. v. Chicago, St. Paul, etc., Ry. (D. C.) 151 Fed. 84, and the decision of this court, per Holt, J., in U. S. v. D., L. & W. Ry. (filed February 14, 1907) 152 Fed. 269.

Second. Assuming that the offense sought to be reached by this indictment is the giving—i. e., the paying—of rebate moneys in 1904, the Elkins act is not ex post facto. It did not impose a punishment for an act which was not punishable when it was committed, nor did it impose additional punishment for such act, nor did it change the rules of evidence; and, if it did none of these things, it does not transgress the constitutional limitation referred to.

Third. This ground of demurrer, if good, would open wide the door to easy infraction of the spirit of the acts regulating interstate commerce. It would only be necessary to issue a through bill of lading to a point previously so obscure as to render the publication of through tariff rates an idle formality, and to follow the shipment to such obscure point by diversion orders which would effectuate the real intent of the parties, while rendering proof of the offense difficult if not impossible. I think that, the moment the various carrying lines over which this sugar passed accepted and acted upon the through bill of lading to Sioux City, openly charging therefor the aggregate of the published tariffs as charged in the indictment, they thereby created a through route and accepted the published aggregates as the lawful and only through charge. Cincinnati, New Orleans & Texas·Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935.

Fourth. The point of duplicity in an indictment entirely similar to this has been passed upon by this court in U. S. v. Delaware, Lackawanna & Western R. R. Co., supra. If I thought that the offense substantially charged in this or any similar indictment was the original meeting of minds pursuant to which rebate payments were made, this argument would have more weight. Under the situation here supposed it is possible to conjure up great possibilities of oppression. If it be a crime to agree to carry any commodity at less than published rates, and the agreement be to carry any offered quantity thereof at a price per 100 pounds less than the published tariff for that weight, it might be possible to base one count of the indictment upon each 100 pounds transported. Without expressing any opinion as to the legality of such a proceeding, it would in my opinion be a great abuse of power

on the part of the law officer attending upon the grand jury. But it is an equally great abuse of the statute to argue that all the overt acts flowing from an originally criminal agreement must necessarily be (so to speak) merged in the agreement. This is a method of capitalizing offenses to be as much discouraged as the undue subdivision thereof. If, however, the payment and acceptance of the rebate be the substantial offense here charged, then I think each substantial payment is properly the subject of separate indictment or count, just as truly as each separate and distinct visit of a burglar to a chest he slowly rifles of a set of silverware constitutes a separate offense, although it was his original intention to take the entire set sooner or later.

Fifth. I do not apprehend that the constitutionality of the original interstate commerce act is at this late day sought to be attacked. But it is suggested that, inasmuch as by recent rulings the shipper's common-law right to enforce by appropriate legal proceedings a reasonable rate of carriage is said to be taken away, so that not only the regulation of carriers but of shippers is now vested in a commission, it therefore follows that the present statutes, as thus interpreted, constitute a deprivation of property rights without due process of law. The subject is an interesting one, and will doubtless receive due consideration when the regulation of commercial transactions by commissioners and boards appointed by executive authority shall have more nearly approached a system than is now the case. It seems to me sufficient for the present argument that property rights, however dear, are not to be ranked higher than those of citizenship and personal liberty; and it is now held that officers appointed by the executive, and boards created by that authority, answering directly to the executive only, may pass upon the status of one who alleges himself to be a native-born citizen of the United States, and, by finding adversely to his assertion the place of his birth, debar him from the only country that he swears he ever knew, and this without any recourse to the courts of his alleged native land, unless there be found in the proceedings of the executive malice or abuse of discretion. U. S. v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040. I think that the deprivation here alleged is very far within the executive power recognized by the case last cited.

Let the demurrer be overruled.