**ROTTENBERG et al. v. UNITED STATES.**
**YAKUS v. SAME.**

Nos. 3885, 3892.

Circuit Court of Appeals, First Circuit.

Aug. 23, 1943.

Leonard Poretsky, John H. Backus, and William H. Lewis, all of Boston, Mass., for Benjamin Rottenberg et al.

Leonard Poretsky, Francis P. Garland, and Joseph Kruger, all of Boston, Mass., for Albert Yakus.

Robert L. Wright, Sp. Asst. to Atty. Gen., and Edmund J. Brandon, U. S. Atty., and William T. McCarthy and Joseph J. Gottlieb, Asst. U. S. Attys., all of Boston, Mass., for the United States.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

In these criminal prosecutions for violations of § 4(a) of the Emergency Price

Control Act, 56 Stat. 28, 50 U.S.C.A.Appendix § 904(a), by making sales at prices in excess of those prescribed by an applicable price regulation, the question is squarely presented whether, or to what extent, the trial court may entertain a defense based upon the alleged invalidity of the regulation. The point was left open in Lockerty v. Phillips, 63 S.Ct. 1019, 87 L. Ed. —, decided May 10, 1943.

No. 3885 embraces two indictments, one against Rottenberg, who was president and treasurer of B. Rottenberg Co., Inc., and one against the corporation. The two indictments were consolidated for trial and are here on a consolidated appeal. Each defendant was convicted on several counts of making sales of wholesale cuts of beef in December, 1942, and January, 1943, at prices higher than the maximum prices as determined under Revised Maximum Price Regulation No. 169,[1] in willful violation of § 4(a) of the Act. Sentence of six months in jail and a fine of $1,000 was imposed upon the individual defendant. The corporate defendant was fined $1,000.

No. 3892 embraces a similar indictment against Yakus, who was president of the Brighton Packing Company. He was convicted on three counts of making sales of wholesale beef cuts in December, 1942, and January, 1943, at prices higher than the maximum prices established by the aforesaid regulation and was sentenced to jail for six months and fined $1,000.

The cases were heard together on appeal in this court. They involve essentially the same questions, and hereafter in this opinion reference will be made only to the proceedings in Rottenberg's case.

At various appropriate stages in the proceedings Rottenberg challenged the constitutionality of the Emergency Price Control Act. The District Court upheld the Act.

The Government introduced sufficient evidence to warrant verdicts of guilty on all the counts which were submitted to the jury.

Rottenberg introduced no testimony except an offer of proof of detailed economic data designed to show that Revised Maximum Price Regulation No. 169 was arbitrary and capricious and failed to provide a fair and equitable margin of profit to slaughterers and wholesalers conducting their business in an efficient manner. The court declined to receive the offer of proof on the ground that § 204 of the Act, 50 U. S.C.A.Appendix § 924, deprived it of jurisdiction to entertain such a defense. Rottenberg duly took exception to this ruling, the correctness of which is the most serious question now before us.

There is first the inquiry whether the Act as a matter of interpretation precludes this sort of defense to the indictments now before us. If so, then we must decide whether it was competent for Congress so to provide "in a statute born of the exigencies of war." Scripps-Howard Radio, Inc. v. Federal Communications Commission, 1942, 316 U.S. 4, 17, 62 S.Ct. 875, 883, 86 L.Ed. 1229.

On July 30, 1941, many months before our country was attacked at Pearl Harbor, the President transmitted to Congress a message setting forth the necessity of legislation to control prices. H.Doc.No. 332, 77th Cong., 1st Sess. He submitted figures to show that inflationary price rises were threatening to undermine our defense effort "unless we act decisively and without delay." After extended consideration the House passed on November 28, 1941, a bill to control prices and rents. H.R. 5990, 77th Cong., 1st Sess. This bill contained quite a different scheme for review of price regulations from what was ultimately enacted. In the first instance review was to be had before a Board of Administrative Review; any person aggrieved by the decision of such board might petition for review in the appropriate circuit court of appeals. The bill contained no provision corresponding to that now found in § 204 (d) of the Act upon which the court below relied in excluding the offer of proof.

On January 2, 1942, the Senate Committee on Banking and Currency reported out the House bill, with substantial amendments, including the review provisions which eventually became law, and which we shall examine in detail later.

The Senate committee report (Sen.Rep. No. 931, 77th Cong., 2d Sess.) pointed out that the House bill had been passed before we entered the war and that the bill needed to be strengthened now that we were embarked upon an "unlimited national mobilization in a war for survival." While the country was concerned with the danger of

---

[1] 7 F.R. 10381. The regulation was issued December 10, 1942, to become effective December 16, 1942.

inflation even before December 7, 1941, "the pressures on the price structure, already enormous, will be multiplied" now that we are engaged in a world war. The committee pictured in vivid terms what would be the disastrous consequences of inflation by way of sapping our national strength and effort and morale. "Effective price control, under these circumstances, must no longer be delayed." The report added: "Price control which cannot be made effective is at least as bad as no price control at all. It will not stop inflation, and enables those who defy regulation to proceed at the expense of the buyers and sellers who unselfishly cooperate in the interests of the emergency."

The Emergency Price Control Act of 1942 became law on January 30, 1942, 50 U.S.C.A.Appendix § 901 et seq.

Section 1(a) of the Act sets forth its purposes and declares that price and rent control are "necessary to the effective prosecution of the present war."

The temporary, emergency character of the legislation was emphasized by the provision in § 1(b) that the Act "shall terminate on June 30, 1943", or upon such earlier date as the President by proclamation, or the Congress by concurrent resolution, may prescribe.[2]

Section 2(a) provides that whenever in the judgment of the Price Administrator the price or prices of a commodity or commodities have risen or threatened to rise to an extent or in a manner inconsistent with the purposes of the Act, "he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." In establishing any maximum price, he is directed, so far as practicable, to ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941, and to make adjustments for such relevant factors as he may determine to be of general applicability. The Administrator is also directed, so far as practicable, before issuing any price regulation, to consult with representative members of the industry affected. Further to assure that no price regulation would be issued without due consideration by the Administrator of the factors involved, it is required that every price regulation issued

by him "shall be accompanied by a statement of the considerations involved in the issuance of such regulation". After a regulation is issued the Administrator is required, if requested by any substantial portion of the industry affected, to appoint an advisory committee truly representative of the industry with whom he shall advise and consult from time to time with respect to the regulation, the form thereof, and classifications, differentiations and adjustments therein. Under § 2(c) any price regulation "may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act."

Section 4(a) provides that it shall be unlawful "for any person to sell or deliver any commodity * * * in violation of any regulation or order under section 2, * * *" This subsection is implemented by § 205(b) which provides that any person "who willfully violates any provision of section 4 of this Act" shall, upon conviction thereof, be subject to a fine or imprisonment or both. In § 205(c) it is provided that "the district courts shall have jurisdiction of criminal proceedings for violations of section 4 of this Act."

Sections 203 and 204 provide in detail the procedure for administrative review, and ultimate court review, of price and rent regulations, first in a special court of the United States known as the Emergency Court of Appeals, and then in the Supreme Court, upon certiorari. This special court, created by § 204(c), consists of three or more judges to be designated by the Chief Justice of the United States from judges of the United States district courts and circuit courts of appeals. It is given the powers of a district court with respect to the jurisdiction conferred upon it, except that it "shall not have power to issue any temporary restraining order or interlocutory decree staying or restraining, in whole or in part, the effectiveness of any regulation or order issued under section 2."

Under § 203(a), within a period of sixty days after the issuance of any regulation under § 2, "any person subject to any provision of such regulation" may "file a protest specifically setting forth objections to any such provision and affidavits or other

---

[2] This terminating date has since been extended to June 30, 1944. 56 Stat. 767, 50 U.S.C.A. Appendix § 901.

written evidence in support of such objections." Within thirty days after the filing of such protest "the Administrator shall either grant or deny such protest in whole or in part, notice such protest for hearing, or provide an opportunity to present further evidence in connection therewith. In the event that the Administrator denies any such protest in whole or in part, he shall inform the protestant of the grounds upon which such decision is based, and of any economic data and other. facts of which the Administrator has taken official notice."

If the Administrator denies such protest, in whole or in part, any person aggrieved by such denial may within thirty days thereafter, under § 204(a), file a complaint with the Emergency Court of Appeals, specifying his objections and praying that the regulation protested be enjoined or set aside in whole or in part. Upon receipt of service of such complaint it is the Administrator's duty to certify and file with the court a transcript of such portions of the protest proceedings as are material to the complaint. The transcript shall include a statement setting forth, so far as practicable, "the economic data and other facts of which the Administrator has taken official notice." Upon the filing of such complaint "the court shall have exclusive jurisdiction to set aside such regulation, order, or price schedule, in whole or in part, to dismiss the complaint, or to remand the proceeding." No objection to such regulation, and no evidence in support of any objection thereto, shall be considered by the court, "unless such objection shall have been set forth by the complainant in the protest or such evidence shall be contained in the transcript." Appropriate provision is made for applications by either party for leave to adduce additional evidence.

Section 204(b) provides that no such regulation shall be enjoined or set aside, in whole or in part, unless the complainant establishes to the satisfaction of the court that the regulation "is not in accordance with law, or is arbitrary or capricious." The effectiveness of any such judgment by the Emergency Court "shall be post-poned until the expiration of thirty days from the entry thereof", except that if petition for certiorari is filed with the Supreme Court within such thirty days, the effectiveness of such judgment "shall be postponed until an order of the Supreme Court denying such petition becomes final, or until other final disposition of the case by the Supreme Court." [3]

The particular provision of the Act upon which the controversy turns in the present cases is found in § 204(d) as follows:

"The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation * * * issued under section 2 * * * and of any provision of any such regulation * * *. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation * * *, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations * * * or any provision of any such regulation * * * or to restrain or enjoin the enforcement of any such provision."

Section 205 contains several subsections in aid of enforcing the Act. Subsection (a) authorizes the Administrator to make application to any appropriate court for an order enjoining violations of § 4. Subsections (b) and (c) contain the provisions for criminal prosecution already referred to. Subsection (d) refers to litigation between private parties in which some provision of the Act, or a regulation issued thereunder, may be involved. Subsection (e) provides that a buyer of a commodity who has paid more than the applicable maximum price may, with some limitations, bring suit against the seller for treble damages in any court of competent jurisdiction. Subsection (f) contains detailed and carefully guarded licensing provisions.

It is the contention of appellants that since the provision of § 204(d), above quoted, is contained in a section of the

3 With respect to this provision the report of the Senate committee states: "This 30-day period is necessary in order to prevent prices from rising without restraint while the Administrator is modifying or supplanting the regulation in accordance with the judgment of the court or preparing a petition for certiorari to the United States Supreme Court. If a petition for a writ of certiorari is filed with the Supreme Court within such 30 days, under the provisions of section 204(d), the effectiveness of such judgment is postponed until final disposition of the case by the Supreme Court." Sen. Rep. No. 931, 77th Cong., 2d Sess., p. 24.

Act prescribing a special procedure by which a person subject to a price regulation may invoke the judicial power to have the regulation set aside, it should be read as meaning no more than that this special statutory procedure is the only means by which such a person may maintain a suit directed to that end; in other words, that none of the regular courts shall have jurisdiction to entertain a suit by such person to set aside any provision of the Act or a regulation thereunder or to restrain the enforcement thereof.

This argument overlooks the breadth of the language in § 204(d). The subsection provides, affirmatively, that the Emergency Court of Appeals, and the Supreme Court on certiorari therefrom, "shall have exclusive jurisdiction to determine the validity of any regulation." Then follows the negative statement of the same idea, significantly expressed in three distinct clauses: Except as provided in § 204, (1) "no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation"; (2) "or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act" or of a regulation thereunder; (3) "or to restrain or enjoin the enforcement of any such provision." (2) and (3) refer aptly to injunction suits brought by a person subject to a regulation. (1) is much broader and seems clearly enough to say that no other court shall have jurisdiction or power to consider the validity of any regulation, however the litigation may originate. Since this is a blanket provision it is natural that it is placed in a section which prescribes the only procedure by which the validity of a regulation may be subjected to court review. It thus became unnecessary to write the same limitation into each of the subsections of § 205 dealing with the various methods of enforcement.

Our interpretation of § 204(d) is confirmed by the legislative history, if confirmation were necessary. The report of the Senate Committee on Banking and Currency (Sen.Rep. No. 931, 77th Cong., 2d Sess.) states (p. 7): "The Emergency Court is established in order to avoid the confusion which would result from conflicting decisions in different circuits on the same regulations. It will also permit the expeditious consideration and disposition of problems arising under the statute by a court familiar with its provisions and operation." And, again, in the same report (pp. 24–25), emphasizing the distinct clauses in the last sentence of § 204(d): "Section 204(d) further provides expressly that no court, other than the Emergency Court and the Supreme Court, shall have jurisdiction or power to consider the validity, constitutional or otherwise, of any regulation or order issued under section 2. It also provides that no court, except as provided in section 204, shall have jurisdiction or power to stay, restrain, enjoin, or set aside (whether by declaratory judgment or otherwise) any provision of the bill authorizing the issuance of such regulation or order, or to restrain or enjoin the enforcement of any provision of any such regulation or order. Thus the bill provides for exclusive jurisdiction in the Emergency Court and in the Supreme Court to determine the validity of regulations or orders issued under section 2. Of course, the courts in which criminal or civil enforcement proceedings are brought have jurisdiction, concurrently with the Emergency Court, to determine the constitutional validity of the statute itself." It is thus clear that the limitations of § 204(d) were intended to apply not only to injunction suits brought by a person affected by a regulation, but also to enforcement proceedings, both criminal and civil, brought under § 205. Any court in which criminal or civil enforcement proceedings are brought may determine the constitutional validity of the Act itself, but in such proceedings consideration of the validity of a regulation is precluded.

Section 4(d) provides: "Nothing in this Act shall be construed to require any person to sell any commodity or to offer any accommodations for rent." Appellants, therefore, were not required to act, but, in effect, the Congressional command to them was that if they chose to act they must act in accordance with an outstanding price regulation until the same is set aside in proceedings directed to that end in accordance with the provisions of §§ 203 and 204.

It is contended that such a command constitutes a denial of due process of law in violation of the Fifth Amendment. We do not think that this is so.

It is beyond all doubt that Congress in the exercise of its war power may control prices as part of a war-time anti-inflation program. United States v. Macintosh, 1931, 283 U.S. 605, 622, 51 S.Ct. 570,

75 L.Ed. 1302; Taylor v. Brown, United States Emergency Court of Appeals, 137 F.2d 654, July 15, 1943. This power is "a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation." Home Building & Loan Ass'n v. Blaisdell, 1934, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413, 88 A.L.R. 1481. The validity under the due process clause of the methods selected by Congress for effectuating price control cannot be judged apart from a consideration of the practical necessities of administration. Jacob Ruppert v. Caffey, 1920, 251 U.S. 264, 299, 301, 40 S. Ct. 141, 64 L.Ed. 260. "The Constitution as a continuously operating charter of government does not demand the impossible or the impractical." Hirabayashi v. United States, 63 S.Ct. 1375, 1387, 87 L.Ed. ——, June 21, 1943. In Nebbia v. New York, 1934, 291 U.S. 502, 539, 54 S.Ct. 505, 517, 78 L.Ed. 940, 89 A.L.R. 1469, the court said, "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." Since the war-time power of Congress to control prices includes the power to adopt such means to this end as might rationally be considered necessary for the effective administration of the regulatory program, the only question remaining to the courts, under the Fifth Amendment, is whether Congress had any rational basis for its judgment that administrative necessities in a scheme of nation-wide price regulation require that price regulations issued by the Administrator must be generally observed until the regulations are set aside pursuant to the orderly review procedure set forth in the Act. Nothing would seem to be gained by expressing the issue in more esoteric terms to disguise the non-technical nature of the judgment the courts are called upon to make under the Fifth Amendment.

■ It is common knowledge that the danger of runaway inflation was acute when Congress passed the Emergency Price Control Act. The Administrator had to move promptly, on the broadest possible front; he had to get out regulations covering great numbers of commodities, affecting a wide range of industries, the full comprehension of each of which is a lifetime study. He could not afford to be a perfectionist in getting the program started.

Congress was well aware that in this hectic enterprise the Administrator might unavoidably put out regulations without a full appreciation of the effect they might have on the delicate interrelations of our complicated economy ·or without having had brought to his attention particular situations in which a regulation as drawn would work unnecessary hardship or dislocations. Soldiers are expected to make the best fight they can with the facilities that are available, inadequate though they may be, and sometimes they have to carry on without full information on what they are up against. It was not to be expected that the Price Administrator would be any less conscientious and diligent in the fight he has to lead on the home front. It was not to be anticipated that he would glory in being "arbitrary or capricious", or that he would be loathe to make needed changes or adjustments if it were shown to him that a regulation in actual operation was not "generally fair and equitable". He is at least as much interested as anybody else in the successful administration of his office.

Furthermore, the Administrator alone has power to recast regulations as circumstances may indicate the need. All that a court could do would be to strike down; it could not draft and put in force a substitute regulation. If a violator could procure an acquittal in a criminal case by convincing the particular district court or jury that the regulation is arbitrary or capricious or not generally fair and equitable, the Government could not appeal; and for practical purposes enforcement of the regulation in that district would be at an end. In other districts the regulation might be upheld. As the Government well says in its brief: "The sudden development of price disparities entirely unrelated to natural geographical differentials would disrupt normal market relationships. Commodities would tend to be drained off toward the area in which higher prices prevailed. Producers in low-price areas would be at a serious disadvantage in procuring goods at the price established by the regulations. The disruption would be the more acute because of wartime shortages in many commodities." The same damaging results would follow if the ordinary courts were empowered to set aside a regulation or grant injunctions against its enforcement.

If some commodities thus got released from price control, even temporarily, the consequences might well be irretrievable, and, our economy being all of a piece, pressures would develop on other commodities to break through their ceilings. Hence, even the Emergency Court of Appeals (which alone has been given power to set aside a regulation on grounds not involving the constitutional validity of the Act itself) is not empowered to grant a stay pending the litigation.[4]

If in every proceeding, civil or criminal, to enforce compliance with the regulations, the Administrator had to present the mass of economic data which might be required to establish the validity of the regulation, and to try the issue de novo as against each defendant, his predominant occupation would become fighting litigation rather than fighting inflation.

In view of these considerations, it is easy to see why Congress chose the particular review procedure set forth in §§ 203 and 204. If a person subject to a regulation believes that it is not generally fair and equitable or causes avoidable hardships or dislocations, he must first make his protest to the Administrator, who is thus given the opportunity to reconsider any challenged provisions in the regulation in the light of further evidence or arguments which may be advanced by the protestant. The Administrator and his staff, the collective entity known as the Office of Price Administration, develop day by day an expertness in the whole field of price regulation certainly beyond that of the courts, which makes it reasonable that a protest should first be reviewed by this agency. Furthermore, as already pointed out, the Administrator is the only one with power to make adjustments or amendments. The Administrator may be convinced by the protest, and take appropriate action. If so, well and good. If not, further review is available in the Emergency Court and finally in the Supreme Court, on the basis of a proper administrative record and with the benefit of a considered written opinion by the Administrator explaining why he deemed the protest not to be well taken. We have already quoted from the Senate committee report the reason why judicial review is channeled through this special court.

No doubt, the judicial review thus provided takes some time before a final adjudi- cation can be reached. But it was not to be supposed that meritorious protests would, in the great majority of cases, have to be pressed to the stage of judicial review. As it has worked out, considering the great number of commodities that have had to be regulated and the millions of people who have been subjected to the regulations, there have been surprisingly few complaints filed in the Emergency Court.[5] So far as individuals may suffer hardship and inconvenience because of the delay involved in the review procedure, this they must bear in the interest of the greater public good resulting from general compliance with the regulations until they are set aside or amended in an orderly way.

The District Court pointed out that in the present cases the regulation was not invalid on its face, but that the question whether it was arbitrary or capricious or failed to conform to the statutory standards depended upon a consideration of extrinsic economic data. In view of the broad separability clause in § 303 of the Act, 50 U.S. C.A.Appendix § 943, the court quite properly confined its ruling under the Fifth Amendment to the facts of the cases before it. We shall observe the same caution. There might be a difference if the regulation as a pure matter of law were invalid on its face; if, for example, it covered a commodity which, under a proper construction of § 302(c), was exempted by Congress from price regulation. Cf. Davies Warehouse Co. v. Brown, United States Emergency Court of Appeals, 137 F.2d 201, May 28, 1943. We intimate no opinion on this.

We conclude that § 204(d), as applied to these appellants, is not bad under the Fifth Amendment.

The Government has cited many cases as furnishing analogies bearing more or less directly on the present problem. See Johnson v. United States, 8 Cir., 1942, 126 F.2d 242; American Bond & Mortgage Co. v. United States, 7 Cir., 1931, 52 F.2d 318, certificate dismissed, 1931, 282 U.S. 374, 51 S.Ct. 118, 75 L.Ed. 395; Bradley v. City of Richmond, 1913, 227 U.S. 477, 485, 33 S.Ct. 318, 57 L.Ed. 603; Texas & Pacific Ry. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 440, 441, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann. Cas. 1075; United States v. Vacuum Oil Co., D.C.W.D.N.Y., 1908, 158 F. 536; Lehigh Valley R. R. Co. v. United States,

---

4 See footnote 3, supra.

5 To date 79 complaints have been filed.

3 Cir., 1911, 188 F. 879. Cf. White v. Johnson, 1931, 282 U.S. 367, 373, 51 S.Ct. 115, 75 L.Ed. 388. It would unduly prolong this opinion to discuss the arguments and asserted distinctions which counsel have addressed to us with reference to these cases. We are satisfied with the conclusion we have reached, without relying on the props of precedent which some of these cases might afford us.

It is not amiss to note that in Hirabayashi v. United States, 63 S.Ct. 1375, 87 L.Ed. ——, June 21, 1943, under the war powers of the President and Congress, the Supreme Court upheld a military order which applied discriminatory treatment to citizens of the United States on the basis of their racial origin, a discrimination which would ordinarily be abhorrent to the Fifth Amendment. The Emergency Price Control Act discloses a much less striking exercise of the broad war power of Congress.

As a further argument against § 204(d) appellants contend that when Congress in § 205(c) vested in the district courts jurisdiction of criminal proceedings, the judicial power which such courts are thus called upon to exercise is derived from Article III of the Constitution and not from Congress; that the question of the relevancy of evidence offered in a criminal trial raises a question of law which must necessarily be decided by the court in the exercise of its judicial power; and that it is unconstitutional for Congress to take from a court having jurisdiction to try a criminal indictment its judicial power to decide a question of relevancy.

But the answer is, that Congress has not taken from the district courts the judicial power to decide any question of relevancy of proffered evidence. The District Court exercised such power in these very cases. It ruled that the Emergency Price Control Act was a valid enactment, and that under the provisions of the Act the proffered evidence was not relevant. Appellants were indicted, not for a violation of the Administrator's price regulation, but for a violation of § 4(a) of the Act. Congress has said that it shall be a crime willfully to sell a commodity for a price in excess of that established by an outstanding price regulation, as long as such regulation has not been set aside by the statutory procedure. This is clearly the meaning and effect of the Act, though in § 204(d) Congress has expressed it in terms of denying "jurisdiction or power" to the courts to consider the validity of the regulation. Hence it was entirely immaterial to the criminal liability of these appellants whether Revised Maximum Price Regulation No. 169 might have been set aside had appellants chosen to avail themselves of the procedure set forth in §§ 203 and 204 of the Act.

Nor have appellants been denied the right of a jury trial as guaranteed by the Sixth Amendment. They have had a jury trial on all the issues relevant under the statute.

Finally, the Act is challenged as constituting an unconstitutional delegation of legislative power to the Price Administrator. This point is not well taken. Opp Cotton Mills, Inc., v. Administrator, 1941, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Mulford v. Smith, 1939, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Hirabayashi v. United States, 63 S.Ct. 1375; 87 L.Ed. ——, decided June 21, 1943. The Emergency Price Control Act was upheld as against the challenge of unconstitutional delegation in Taylor v. Brown, decided by the United States Emergency Court of Appeals, July 15, 1943, 137 F.2d 654. There is no need to repeat or elaborate what was said there.

The judgments of the District Court are affirmed.